**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VELOCITY PATENT LLC,<br><br>*Plaintiff,*<br>v.<br><br>FCA US LLC,<br><br>*Defendant.* | Civil Action No. 1:13-cv-08419<br><br>**REDACTED VERSION**<br><br>Judge Thomas M. Durkin<br>Magistrate Judge Michael T. Mason |

**DEFENDANT FCA US LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION**
**<u>TO EXCLUDE TESTIMONY OF MR. CARTER AND MR. IYER</u>**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 3

III. LEGAL STANDARD ........ 5

A. The *Daubert* Standard ........ 5

B. Damages in Patent Infringement Cases ........ 6

IV. ARGUMENT ........ 7

A. Velocity's Damages Experts' Opinions Consider the Fuel Efficiency Notification as a Whole, Without Apportioning for Non-Conventional Features ........ 7

B. Velocity's Experts Admit that Fuel Efficiency Notifications Are Conventional ........ 8

C. Velocity's Experts' Methodologies Run Counter to Precedent That Mandates Apportionment of the Reasonable Royalty to the Incremental Value the Patented Invention Adds to the Accused Functionality ........ 10

V. CONCLUSION ........ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astrazeneca AV v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)....................11, 12

*Cage v. City of Chicago*,
979 F. Supp. 2d 787 (N.D. Ill. 2013)....................5

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................6

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)....................5, 6, 13

*Dow Chem. Co. v. Mee Indus., Inc.*,
341 F.3d 1370 (Fed. Cir. 2003)....................6

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp. LLC*,
879 F.3d 1332 (Fed. Cir. 2018)....................1

*Garretson v. Clark*,
111 U.S. 120 (1884)....................1, 10

*Helios Software, LLC v. Spectorsoft Corp.*,
No. 12-081, 2014 WL 4796111 (D. Del. Sept. 18, 2014)....................2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................1

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009)....................5

*Network Protection Sciences, LLC v. Fortinet, Inc.*,
No. 12-01106, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013)....................2

*Realtime Data, LLC v. Oracle Am., Inc.*,
No. 6:16-cv-00088, 2017 U.S. Dist. LEXIS 187717 (E.D. Tex. Mar. 30, 2017)....................12, 13

*Rembrandt Social Media, LP v. Facebook, Inc.*,
No. 1:13-cv-158, 2013 WL 6327852 (E.D. Va. Dec. 3, 2013)....................2

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) (*en banc*)....................6

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)....................................................................................1

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)...............................................................................1, 6

**Statutes**

35 U.S.C. § 284...............................................................................................................5

**Other Authorities**

Federal Rule of Evidence 702.........................................................................................5

Federal Rule of Evidence 703.........................................................................................5

# I. INTRODUCTION

Over 125 years ago, in the context of patent damages, the Supreme Court declared:

> When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance. He must separate its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated.

*Garretson v. Clark*, 111 U.S. 120, 121 (1884). Today, this law still binds and guides the Federal Circuit, which has explained: "[t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp. LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). Put another way, "the patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product." *Id.* "These strict requirements . . . ensure that a reasonable royalty does not overreach and encompass components not covered by the patent." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (internal quotation and citations omitted).

The Federal Circuit and district courts strictly apply this law to damage theories that fail to: (1) apportion between patented and unpatented (or conventional) aspects of an accused product or (2) satisfy the "entire market value rule" with proof that the patented aspect drives the overall demand for the accused product.[1] *See id.* at 1328 (excluding testimony where the expert "did not even attempt to subtract any other unpatented elements from the base"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("one way in which the error of an improperly admitted entire market value rule theory manifests itself

[1] The entire market value rule permits patentees to use the value of an entire accused product as a basis for damages only if it proves that the patented features drive demand for the entire accused product. *LaserDynamics*, 694 F.3d at 67. Velocity has not argued—much less attempted to prove—that the entire market value rule should apply here.

is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only"); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (holding that "to be admissible," expert testimony on a reasonable royalty rate must "carefully tie proof of damages to the claimed invention's footprint in the market place"); *see also Helios Software, LLC v. Spectorsoft Corp.*, No. 12-081, 2014 WL 4796111, at *7 (D. Del. Sept. 18, 2014) (excluding testimony "[i]n light of [expert]'s failure to satisfy either the apportionment requirement or the entire market value rule"); *Rembrandt Social Media, LP v. Facebook, Inc.*, No. 1:13-cv-158, 2013 WL 6327852, at *5-6 (E.D. Va. Dec. 3, 2013) (excluding unapportioned revenue numbers because "such inflated numbers before a jury would be prejudicial even if [the defendant] has the opportunity to cross-examine the expert about the royalty base."); *Network Protection Sciences, LLC v. Fortinet, Inc.*, No. 12-01106, 2013 WL 5402089, at *7-8 (N.D. Cal. Sept. 26, 2013) (explaining "risk of calculation error," "impermissible speculation," and "unfair jury prejudice" as problems with allowing testimony in violation of the entire market value rule).

This precedent dooms Velocity's damage theory in this case. Velocity's damages expert, Andrew Carter, intends to present a damage model based on his estimated value of FCA's accused fuel efficiency notifications without apportioning to the patented improvements of the '781 patent. Although all of Velocity's experts admit (as they must) that Velocity did not invent fuel efficiency notifications, Mr. Carter fails to separate the patented improvement from its unpatented and conventional aspects. Instead, Mr. Carter bases his reasonable royalty opinion on the value of "[t]he whole concept of this whole thing." Ex. 2 at 89:18-19. But Velocity did not invent the "whole concept of this whole thing." According to binding precedent, therefore, this

Court must exercise its gatekeeping function to exclude this legally impermissible theory (and the related valuation survey by another Velocity expert) from trial.

## II. FACTUAL BACKGROUND

The original patentee, TAS Distributing Co., Inc., ("TAS") never licensed nor commercialized the '781 patent. Ex. 3 at ¶ 48. Instead, TAS sold the '781 patent to a group of patent attorneys in 2013, who formed and transferred the assets to the plaintiff, Velocity Patent LLC ("Velocity"). *Id.* at ¶¶ 48-50. Velocity purchased all rights and title to the '781 patent [redacted] *Id.* at ¶ 48.

Since 2013, Velocity has licensed the '781 patent [redacted] Ex. 3 at ¶ 103. None was for more than [redacted], as a fully paid-up, lump sum, and one was for less than [redacted] *Id.* The licensees include FCA's competitors in the automotive market. *Id.* In analyzing the appropriate damages in this case, Plaintiff's damages expert, Mr. Carter, rejects this licensing history and concludes instead that FCA would have *willingly* agreed to pay nearly [redacted] the amount paid by its competitors for the same rights—a royalty in excess of [redacted] Ex. 1 at 3.

Every asserted claim of the '781 patent recites a "fuel overinjection notification circuit." Velocity alleges that three FCA features that provide information about fuel consumption to the driver meet this claim limitation: (1) the Fuel Saver Indicator, (2) the miles-per-gallon ("MPG") display, and (3) the Fiat Eco Index Display. *See* Dkt. No. 348 at ¶¶ 21-24. For example, the accused MPG display (which is one of several screens that a user can toggle through on the dash to get desired information) indicates the vehicle's current MPG and average MPG (over some time period):




Ignoring the manner in which the information is generated, Velocity's damage theory focuses on "the outward manifestation of using this fuel overinjection notification." Ex. 2 at 58:8-59:8.

Velocity retained two experts to provide opinions relevant to damages. The first, Shankar Iyer, conducted a consumer survey on the ideal price point for the "outward manifestation" of the accused fuel efficiency notification features. The second, Andrew Carter, provided an opinion on the appropriate reasonable royalty.

To quantify a royalty, Mr. Carter first estimates the revenue that FCA could receive if it sold the fuel efficiency notifications as stand-alone features.[2] Ex. 1 at 87-95; Ex. 2 at 55:17-56:22. Relying heavily on Mr. Iyer's survey, Mr. Carter determined the "value" of the accused features to be $50-60 (reflecting the price range he believes consumers would pay). *Id.* From there, Mr. Carter estimated FCA's potential profits associated with the accused features by

[2] FCA does not sell the accused fuel efficiency notification features separately—they are integrated parts of the dashboard's instrument cluster. Thus, Mr. Carter relied on proxy information: 1) Mr. Iyer's consumer survey of potential price points; 2) a survey of aftermarket device retail prices; 3) an FCA document presenting a value for the hundreds of vehicle features, including some of the accused fuel efficiency notifications; and 4) a survey regarding the potential fuel cost savings a consumer may expect using a fuel economy notification. Ex. 1 at 87-94.

subtracting the [redacted] and applying [redacted] to determine that FCA could have achieved approximately [redacted] in profit per vehicle for including the feature. *Id.* at 94-95. Mr. Carter then opines that FCA would have agreed to split these hypothetical profits 50/50 with the patentee at the hypothetical negotiation, thus agreeing to a royalty rate of [redacted] per FCA vehicle equipped with an accused fuel efficiency notification. *Id.* at 97-99. Finally, Mr. Carter applies this [redacted] rate to every vehicle with an accused fuel efficiency notification, resulting in a total reasonable royalty calculation of [redacted] *Id.* at 99.

## III. LEGAL STANDARD

### A. The *Daubert* Standard

Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact in determining the facts at issue or understanding the subject matter at hand. *See* Fed. R. Evid. 702. The admissibility standard requires that the expert testimony be sufficiently reliable and relevant. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The trial judge must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In doing so, the judge must ensure that the expert has "reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702, and that "experts in the particular field would reasonably rely on" the data relied upon by the expert in forming an opinion. Fed. R. Evid. 703.

"The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "[A]ny step that renders the analysis unreliable under the *Daubert* factors

renders the expert's testimony inadmissible." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 808 (N.D. Ill. 2013); *see also* Fed. R. Evid. 702.

### B. Damages in Patent Infringement Cases

A patentee is entitled to damages for infringement under 35 U.S.C. § 284, which provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). To determine the reasonable royalty, patentees commonly consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. *Id.* at 1324-25; *Georgia-Pacific Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (*en banc*).

The Federal Circuit has repeatedly emphasized the importance of *Daubert* in the damages context, cautioning that "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented – using whatever methodology – is sufficiently reliable to support a damages award." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *VirnetX*, 767 F.3d at 1327.

## IV. ARGUMENT

### A. Velocity's Damages Experts' Opinions Consider the Fuel Efficiency Notification as a Whole, Without Apportioning for Non-Conventional Features

Both Mr. Carter and Mr. Iyer's opinions value the accused fuel efficiency notification features in their entirety rather than any incremental value that the '781 patent brought to already-existing fuel efficiency notifications. For example, Mr. Iyer's survey asked respondents to value the notification as a whole; not its inventive, non-conventional aspects. He described the "tested feature" that respondents were asked to evaluate as the notifications themselves, as shown below.

> The Current Fuel Use Notification feature provides real time feedback to you regarding current fuel usage. With this feature, you are given real time notifications that indicate when you are using excessive fuel and, contrarily, when you are driving fuel efficiently.
>
> Below is an example of a notification.




> In this example, the current fuel use is 25 MPG, which exceeds the average fuel use of 18.3 MPG shown by the red arrow. With this feature, real time feedback would show up with color changes:
>
> - When you are driving fuel efficiently, this feature will notify you by showing the green segment in the display, as shown above.
> - When you are using fuel excessively, this feature will notify you with a change in segment color to red (not shown).

> Notifications may vary depending on the type of display in a particular vehicle. Another example of a notification is shown below. With this feature, you would be notified by the word "on" next to "ECO" when you are driving fuel efficiently. When you are using excessive fuel, the "on" notification disappears.




> This feature gives you real time feedback on how efficiently you are using fuel. It does not, in and of itself, increase or decrease fuel efficiency. Upon receiving the notification that you are using excessive fuel, you may choose to act upon it, for example, release your foot from the accelerator to reduce the amount of fuel being supplied to the engine.

Ex. 4, Ex. 6 at 6-7. As Mr. Iyer freely admits, his description relates only to what the consumer may observe when the fuel efficiency notification circuit is activated or inactivated; and *not* how the determination is made to activate it. Ex. 5 at 236:8-237:3; 237:12-239:4.

Mr. Carter likewise admitted that his reasonable royalty opinion looks to the value of the accused fuel efficiency notification as a whole. Apparently relying on a conversation with Velocity's technical expert, Mr. Wilson, Mr. Carter explained: "What I have attempted to do is look at the profit attributable to the infringing features . . . There's no further dividing because it is the profit that is attributable to the feature." Ex. 2 at 66:17-69:21. According to Mr. Carter's theory, no further apportionment is needed because he understands that the '781 patent provides the "core functionality" of the accused fuel efficiency notifications. Ex. 2 at 71:7-15.

**B. Velocity's Experts Admit that Fuel Efficiency Notifications Are Conventional**

Although Mr. Carter's damage theory is premised on the value of the fuel efficiency notification features as a whole, fuel efficiency notifications predated the '781 patent, and were well-known in the industry. This fact is beyond any genuine dispute. *See, e.g.* Ex. 6 at 177:1-6 ("There are other disclosures of devices that include a circuit for a fuel overinjection notification"); Dkt. No. 351, Ex. 10 at ¶¶ 46-48, 61, 72; Ex. 3 at ¶¶ 42-47, 221-232; Dkt. No.

351, Ex. 2 at ¶¶ 90-138 (failing to present arguments regarding fuel efficiency notifications); Dkt. No. 370 at 13-15 (same). Even the '781 patent itself describes known fuel efficiency notifications as part of its "background" discussion. Dkt. No. 348, Ex. 1 at 1:26-48.

In fact, over the course of this litigation, FCA has cited dozens of prior art references that disclose the same types of driver displays and indicators that Velocity argues constitutes a "fuel overinjection notification circuit." *See, e.g.* Ex. 7, Ex. A[11] at 2, Ex. A[4] at 5-6; Ex. 8, Ex. A[26] at 8-11.[3] Indeed, when asked explicitly to confirm that "the '781 patent is not the first disclosure of a fuel overinjection notification circuit," Velocity's technical expert confirmed: "Correct. There are other disclosures of devices that include a circuit for a fuel overinjection notification." Ex. 6 at 177:1-12; 290:10-21 ("there are certainly other ways to display . . . fuel economy information").

Velocity's damages expert, Mr. Carter, testified that "[a]s I understand it, the ability to . . . have these messages was already largely there." Ex. 2 at 75:14-16; *see also* 78:11-13 ("I mean generally there are other patents that speak to some type of fuel economy notifications."); 90:1-8 ("there are other things that could provide a consumer some type of [fuel economy] feedback, right."); 100:17-101:17 ("As I've noted in my report, right I've said that this sort of concept of driving efficiently, its obviously been around . . . . [T]he concept of wanting to have some way to help a driver drive more efficiently, that concept has been around.").

---

[3] As an example of a fuel efficiency notification, FCA's damages expert identified a 1978 magazine description of a Cadillac Seville a fuel economy display. Ex. 9. Mr. Carter admitted that the Cadillac Seville notification provided a user information about his fuel efficiency, and was unable to identify any specific differences between the Cadillac fuel efficiency notification and the claimed invention or those accused in the case. Ex. 2 at 127:17-136:18. ("[B]y definition it has to be different. The '781 patent has patented, if we are in the damages world, it has to be different.").

### C. Velocity's Experts' Methodologies Run Counter to Precedent That Mandates Apportionment of the Reasonable Royalty to the Incremental Value the Patented Invention Adds to the Accused Functionality

Despite conceding that Velocity did not invent the concept or idea of providing fuel efficiency notifications to the vehicle driver, Mr. Carter made no attempt to identify or separate the conventional aspects of the accused fuel efficiency notification features from patented improvements when valuing the accused feature. Mr. Carter's damage model instead values the entire accused feature as if Velocity invented the whole thing. As a result, his model impermissibly attributes "value" to Velocity's patent for admittedly conventional aspects Velocity had nothing to do with.

When urged to identify unconventional aspects, he repeatedly argued that he only needed to compare costs and benefits of the claimed invention to specific non-infringing alternatives that FCA offered. Ex. 2 at 85:20-88:4; 90:1-91:12; 95:20-99:3; 100:7-102:3; 112:2-116:14; 129:4-132:18. But that is not the law. Damages must be apportioned to only the value that the "[patented] improvement has added to the usefulness of the machine," separate from any known or conventional features. *Garrettson*, 111 U.S. at 121. In *Garrettson*, as here, "the plaintiff complied with neither part of this rule. He produced no evidence to apportion the profits or damages between the improvement constituted the patented feature and the other features of the mop. His evidence went only to show the cost of the whole mop and the price at which it was sold. . . . It could not be presented that the entire value of the mop head was attributable to the feature patented." *Id.* In this case, it is beyond dispute that fuel efficiency notifications were well-known prior to the '781 patent; thus, as in *Garrettson*, Velocity's damage theory is flawed because it is premised on the whole value of the well-known device.

Velocity's validity positions in this case suggest that the improvement of the '781 patent is the way the system determines when to activate the notification.[4] *See, e.g.* Ex. 2 at ¶¶ 116-30, 136-38; Dkt. No. 370 at 13-14. For example, at summary judgment, Velocity disputed whether a prior art reference disclosed using the claimed sensors to activate a fuel efficiency notification, but did not dispute that the reference disclosed a "fuel overinjection notification circuit." Dkt. No. 370 at 13-15. Velocity's technical expert, Mr. Wilson, similarly disputed whether several pieces of prior art disclosed the required algorithm for determining whether to activate a fuel overinjection notification (described in Figures 2A-2B of the '781 patent), but not whether they disclosed a fuel efficiency notification itself. Ex. 2 at ¶¶ 90-138.

This improvement relates only to the manner in which the system determines when to activate a notification—functionality that is *invisible* to the driver. By contrast, Mr. Iyer and Mr. Carter valued the general concept of providing the driver with a *visible* notification. Mr. Iyer admitted that his survey respondents "[were] not asked [ ] to ascertain one way or another whether they value the equations and computer code which may go into the notifications. They were asked to value the notifications themselves or the fact of the notifications." Ex. 5 at 239:1-9.[5] But again, Velocity did not invent the notifications themselves, or the fact of the notifications.

---

[4] The '781 patent could not be patenting an improvement in the way that a visual display is presented to the driver because not only are the claims silent on display, but the '781 patent does not mention a visual display, referring instead only to an audible driver notification. *See* Dkt. No. 348, Ex. 1 at 12:10-14; Fig. 2B (steps 96, 104).

[5] The other evidence that Mr. Carter considered in valuing the accused feature likewise relates solely to the notification itself, and not how the system determines that the notification should be activated. Ex. 1 at 97-98. Mr. Carter's discussion of aftermarket device retail prices considers the devices as a whole, and not the mechanisms for determining when to provide a display. *Id.* at 89-90. The FCA document that Mr. Carter relies on, which provides a value estimate for the accused Fuel Saver Indicator and MPG displays similarly considers those features as a whole.

The fact that the claims recite a "fuel overinjection notification circuit" which is allegedly the "core functionality" of the accused features does not save the damage theory. Ex. 1 at 95; Ex. 2 at 70:11-71:15; Ex. 4 at ¶¶ 8-9; Ex. 5 at 160:6-161:19. As the Federal Circuit explained: "When a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements, the court ***must*** determine how to account for ***the relative value*** of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone." *Astrazeneca AV v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) (emphasis added). The patentee is entitled only to compensation for the value its patent provides "beyond the value conferred by the conventional elements alone." *Id.*

Here, none of Velocity's experts performed the proper analysis to value unconventional elements of the claimed invention. Velocity's technical expert, Mr. Wilson, admitted that fuel efficiency notifications themselves were well-known before the '781 patent, and performed no analysis or valuation of any unconventional components of the '781 patent. Ex. 6 at 288:19-289:16. Mr. Carter likewise admitted prior fuel efficiency notifications existed, but he based his reasonable royalty on the value of the accused features as a whole, improperly assuming that 100% of the value of the notification is attributable to the '781 patent. *Id.*; Ex. 1 at 97-99.

This case is like *Realtime Data, LLC v. Oracle Am., Inc.*, No. 6:16-cv-00088, 2017 U.S. Dist. LEXIS 187717 at *15-20 (E.D. Tex. Mar. 30, 2017), where the district court excluded the plaintiff's damage theory because it was not limited to valuing the patent's point of novelty "(i.e., the combination of two compression techniques), separate from the compression techniques individually." *Id.* at *16-17. There, the patentee argued that a proper apportionment

---

*Id.* at 87-88. Finally, the survey regarding potential fuel savings also considers the value of the notification itself. *Id.* at 88-89.

analysis is defined by the claims, and thus, it was proper for its experts to combine the values of the two compression algorithms in the accused products because the claims required two compression algorithms. *Id.* at *17. The court disagreed, relying on Federal Circuit precedent to hold that the appropriate damages must be tied to the "incremental benefit" of the patented invention *only*, not the sum of the separately valued accused features, even if they each represented individually recited claim elements. *Id.* at *18-19.[6]

In *Realtime*, where the patented improvement was combining two known compression algorithms, any reasonable royalty must be limited to the incremental value gained by the combination. *Id.* at *15-17. And the patentee's damage theory that valued the individual (known) compression techniques themselves was excluded. *Id.* at *25. Here, any alleged patented improvement lies in the particular inputs and the manner in which the patent determines when to activate a (known) fuel efficiency notification. Velocity's damage theory is not tied to that incremental improvement and therefore should be excluded.

## V. CONCLUSION

Attempting to reach a royalty amount that far exceeds the value of the '781 patent, Velocity's experts failed to apportion their valuations to the unconventional aspects of the accused products, instead valuing the whole (known) concept of "giving the consumer feedback on their driving so they can drive more fuel efficiently." Ex. 2 at 89:17-22. Mr. Iyer's survey results, and Mr. Carter's reasonable royalty analysis are both therefore unreliable and must be excluded under *Daubert*.

---

[6] The district court also noted that the plaintiff "cannot simply point to [its damages expert's] *Georgia-Pacific* analysis and argue that any shortcomings with [the technical witness'] apportionment methodology can be resolved there." *Id.* at *20.

Dated: July 9, 2018

Respectfully submitted,

*/s/ Frank C. Cimino, Jr.*

Frank C. Cimino, Jr.
Megan S, Woodworth
Jeffri A. Kaminski
Jonathan L. Falkler
Leslie A. Lee
**VENABLE LLP**
600 Massachusetts Ave NW
Washington, DC 20004
(202) 344-4569
(202) 344-4048
*fccimino@venable.com*
*jakaminski@venable.com*

P. Stephen Fardy
Brian W. Bell
Jonna M. Reilly
**SWANSON, MARTIN & BELL, LLP**
330 North Wabash, Suite 3300
Chicago, IL 60611
(312) 321-9100
*sfardy@smbtrials.com*
*bbell@smbtrials.com*
*jreilly@smbtrials.com*

***Attorneys for Defendant FCA US LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on this 9th day of July, 2018 via the Court's CM/ECF system on all counsel of record.

*/s/ Frank C. Cimino, Jr.*
Frank C. Cimino, Jr.